# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| LLOYD H. PETERSON, | CV 18-07-BLG-TJC |
| Plaintiff, | |
| vs. | **ORDER** |
| NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration, | |
| Defendant. | |

On January 16, 2018, Plaintiff Lloyd H. Peterson ("Plaintiff") filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner" or "Defendant") regarding the denial of Plaintiff's claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. (Doc. 2.) On April 2, 2018, Defendant filed the Administrative Record ("A.R."). (Doc. 6.)

Presently before the Court is Plaintiff's motion for summary judgment, seeking reversal of Defendant's denial and remand for an award of disability benefits, or alternatively for further administrative proceedings. (Doc. 11.) The motion is fully briefed and ripe for the Court's review. (Docs. 11-13.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court finds that the case should be **REMANDED** for further administrative proceedings.

## I.   PROCEDURAL BACKGROUND

Plaintiff filed applications for disability insurance benefits and supplemental security income on August 26, 2014.  (A.R. 202-212.)  Plaintiff alleged he has been unable to work since May 7, 2013.  (A.R. 202.)  The Social Security Administration denied Plaintiff's applications initially on May 20, 2015, and upon reconsideration on September 1, 2015.  (A.R. 134-142.)

On September 30, 2015, Plaintiff requested a hearing.  (A.R. 146.) Administrative Law Judge Michele Kelley (the "ALJ") held a hearing on August 31, 2016.  (A.R. 38.)  On October 19, 2016, the ALJ issued a written decision finding Plaintiff not disabled.  (A.R. 17-31.)

Plaintiff requested review of the decision, and on November 20, 2017, the Appeals Council denied Plaintiff's request for review.  (A.R. 1-5.)  Thereafter, Plaintiff filed the instant action.

## II.   LEGAL STANDARDS

### A.   Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g),

1383(c)(3). The scope of judicial review is limited. The Court must affirm the

Commissioner's decision unless it "is not supported by substantial evidence or it is

based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). *See*

*also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may

reverse the ALJ's decision to deny benefits only if it is based upon legal error or is

not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human*

*Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a

preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d

1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which,

considering the record as a whole, a reasonable person might accept as adequate to

support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record as a

whole, the Court must weigh both the evidence that supports and detracts from the

ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v.*

*Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975). The Court must uphold the

denial of benefits if the evidence is susceptible to more than one rational

interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400

F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one

rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44

F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing

the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary.").  However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

### B.      Determination of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) she suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work she previously performed, or any other substantial gainful employment which exists in the national economy.  42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A).  A claimant must meet both requirements to be classified as disabled.  *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process.  If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin*., 223 F.3d 968, 974 (9th Cir. 2000)).  The five steps are:

1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett v. Apfel*, 180 F.3d 1094, 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

## III.  FACTUAL BACKGROUND

Plaintiff claims to suffer from the severe impairments of back problems, arthritis, and carpal tunnel.  (A.R. 240.)  He asserts that these impairments render him incapable of performing substantial gainful employment.

### A.  The Hearing

A hearing was held before the ALJ in Billings, Montana on August 21, 2016.  (A.R. 40-87.)  Plaintiff testified that he has ongoing problems with lower back pain, numbness in his feet and left leg, and swelling and numbness in his hands.  (A.R. 49, 50, 57.)  Plaintiff explained he previously worked as a kitchen manager, cook, oil well floor hand, sandblaster, and construction laborer.  (A.R. 45-47; 70-73.)  He testified that he more recently applied for a job as a cook with the help of a job coach at a vocational rehabilitation center, but he did not get the job because his symptoms restrict him to working only twenty hours per week. (A.R. 49, 50.)

Regarding his physical limitations, Plaintiff testified that he has ongoing symptoms with his hands, feet, and back.  He explained that he had carpal tunnel surgery to alleviate his hand pain.  (A.R. 50.)  Although the pain is gone, he continues to experience constant numbness and swelling in his hands.  (A.R. 50.) He stated that these symptoms cause his hands to cramp, and as a result he drops items and has trouble picking things up.  (A.R. 51.)   For example, he has difficulty

picking up items like pencils and hammers, and has dropped cups, forks, and pots of soup.  (A.R. 51.)  He further explained that his hand problems prevent him from cooking for fear he will drop a pan or hurt himself.  (A.R. 53.)  Plaintiff also testified that although he can make coffee in the morning, he relies on his girlfriend to pour it because he is afraid he will drop the pot.  (A.R. 59.)  He estimated he can use his hands to perform a repetitive activity for one hour each day.  (A.R. 53-54.)

As to Plaintiff's back pain, he testified he is cautious with his movements, because a twist or tweak of his back can render him disabled for four to five days.  (A.R. 54-55.)  He also stated that he has difficulty standing for long periods of time, especially on hard surfaces.  (A.R. 55.)  He estimated that he could stand for three hours with breaks.  (A.R. 57.)  Plaintiff also estimated he can walk about one block.  (A.R. 55.)  He testified that his lower back tightens, creating sharp pains through his hips and toes, and eventually causing his feet to go numb.  (A.R. 57.)  Plaintiff also indicated that his back pain and associated numbness are present even when he is sitting.  (A.R. 57-58.)

Regarding his activities, Plaintiff stated that he usually spends time on his recliner.  (A.R. 58.)  He wakes up early due to his back pain, makes coffee, and sits on his recliner, or at a picnic table in his back yard where he throws a ball for his dogs.  (A.R. 59.)  He testified that he had to hire someone to mow his lawn because his pain prevents him from doing it himself.  (A.R. 58, 61.)  He also testified that

he cannot walk his dogs because one of them pulls too hard and he cannot walk very far.  (A.R. 60.)  He does not go shopping because he is afraid he will fall.  (A.R. 60.)  Plaintiff also testified that he tries to empty the dishwasher, but he has problems if there are too many dishes on the bottom rack.  (A.R. 60.)

### B.    Medical Evidence

#### a.  *Darryl Espeland, M.D.*

Plaintiff has seen Dr. Espeland as his primary physician since 2011.  (A.R. 375-376, 353-356, 380, 383-385.)  In 2011, Dr. Espeland ordered an MRI of Plaintiff's lumbar spine.  (A.R. 375.)  The imaging showed degenerative changes and disk bulges at multiple levels, without disc herniation or severe spinal stenosis.  There was, however, moderately severe to severe foraminal bilateral narrowing with possible bilateral nerve root compression at the L4-5 level.  (A.R. 375-376.)  Plaintiff received an epidural steroid injection at the L4-5 level on December 9, 2011.  (A.R. 377.)

On October 1, 2013, Plaintiff saw Dr. Espeland for recertification for the Medical Marijuana Program.  (A.R. 356.)  During the visit, Plaintiff complained of worsening bilateral hand numbness.  (A.R. 356.)  Upon examination, Dr. Espeland noted hypothenar atrophy on Plaintiff's left hand and a positive Tinel's sign, which he suspected indicated carpal tunnel syndrome.  (A.R. 356.)  He advised Plaintiff to wear wrist splints.  (A.R. 356.)  Apart from Plaintiff's hand complaints, Dr.

Espeland noted that he was doing okay.  (A.R. 356.)  He stated that Plaintiff's back was good, but he did have intermittent sciatica flares.  (A.R. 356.)

Plaintiff saw Dr. Espeland again on March 20, 2014.  (A.R. 354.)  Plaintiff complained of back pain in his mid-lumbar area.  (A.R. 354.)  Dr. Espeland noted that Plaintiff's gait was symmetrical and smooth, but that Plaintiff was hesitant to lock his knees.  (A.R. 354.)  Dr. Espeland also examined Plaintiff's hands, and noted they were unchanged with some atrophy in both hands.  (A.R. 354.)  Plaintiff had a positive straight leg raise on the right and a negative on the left.  (A.R. 354.)  Dr. Espeland opined that fixing Plaintiff's hands would "make a lot of difference as far as his ability to work and be active."  (A.R. 354.)  Dr. Espeland also counseled Plaintiff about his employment, stating "I think he is not destined to stay in the same employment that he is in now, which is cooking, being on hard surfaces, lifting, etc."  (A.R. 354.)  He prescribed Plaintiff an anti-inflammatory. (A.R. 354.)

On October 7, 2014, Plaintiff saw Dr. Espeland for recertification for the Medical Marijuana Program.  (A.R. 353.)  Dr. Espeland noted that Plaintiff's back pain and sciatica remain unchanged.  (A.R. 353.)  He discussed that Plaintiff would undergo carpal tunnel surgery on October 10, 2014.  (A.R. 353.)  He also noted that Plaintiff had an EMG study that indicated he may have a cervical lesion. (A.R. 353.)  Dr. Espeland examined Plaintiff and found his hands did not show any

sign of atrophy, but they did appear swollen.  (A.R. 353.)  He also noted that

Plaintiff ambulated with a limp on the left side.  (A.R. 353.)  Finally, he stated that

he believes Plaintiff wants to work, but work would be very difficult for him unless

his back problems are addressed.  (A.R. 353.)

On April 16, 2015, Plaintiff had an x-ray of his lumbar spine.  The images

showed limited range of motion between flexion and extension, and little

movement at all at the L3-4, L4-5 and L5-S1 levels.  (A.R. 381.)  Apart from

limited range of motion, no acute radiographic abnormality of the spine was found.

(A.R. 381.)

Plaintiff saw Dr. Espeland again on October 15, 2015.  (A.R. 380.)  Dr.

Espeland noted Plaintiff's history of chronic low back pain, severe degenerative

joint disease, and degenerative disc disease, primarily of the lumbar spine.  (A.R.

380.)  He indicated Plaintiff had an obvious limp on the left side and was hesitant

to lock his knees.  (A.R. 380.)

Plaintiff had an MRI of his lumbar and cervical spine on September 7, 2016.

(A.R. 383.)  Regarding his cervical spine, the MRI showed increased cervical

lordosis which may be positional, and multilevel endplate osteophytosis, most

prominent at the C3-4 and C5-6 levels.  (A.R. 383.)  There was also joint

hypertrophy at most levels, and moderate to severe bilateral neural foraminal

narrowing at the C5-6, C6-7, and C7-T1 levels.  (A.R. 383.)

The lumbar MRI showed a "transitional type lower spine with partial sacralization" and "[a]cquired type spinal stenosis related to bulging disc, facet, and ligament hypertrophy. . . ." (A.R. 384-385.) There was indentation of the ventral thecal sac at L1-2, and mild indentation of the sac at L2-3. Moderate canal stenosis was found at L3-4. (A.R. 384.) At L4-5, there was moderate central canal and foraminal narrowing due to bulging disc, facet, and ligament hypertrophy. (A.R. 384.) At L5-S1, a mild degree of central stenosis and foraminal narrowing was found.

        b. *Thomas Owen, M.D.*

Plaintiff saw Dr. Owen for his hand pain beginning on April 10, 2014. (A.R. 348.) Dr. Owen noted that Plaintiff had carpal tunnel as well as cervical and lumbar degenerative disc disease. (A.R. 348.) Plaintiff reported constant numbness in his hands and neck pain. (A.R. 348.) Dr. Owen performed an exam and noted Plaintiff's cervical spine range of motion was painful and restricted. He also noted Plaintiff had a positive Spurling test, a normal gait with a slight crouch, and obvious atrophy in his hand. (A.R. 349.) He further indicated Plaintiff had decreased sensation to light touch in his median nerve. (A.R. 349.) He did not note any swelling. (A.R. 349.) He also discussed the results of Plaintiff's EMG, which showed median nerve compression at the wrist. (A.R. 349.)

Dr. Owen discussed his suspicion that Plaintiff suffered from double crush phenomenon. (A.R. 350.) He recommended Plaintiff have carpal tunnel release surgery to prevent the atrophy and nerve damage from progressing. (A.R. 350.) Dr. Owen also explained to Plaintiff that he may not experience recovery of the atrophy and nerve damage which has already occurred. (A.R. 350.) He also discussed the possibility that alleviating his problems might require intervention in his cervical spine. (A.R. 350.) Dr. Owen offered additional cervical spine workup, but Plaintiff declined for financial reasons. (A.R. 350.)

Dr. Owen successfully performed Plaintiff's carpal tunnel surgery on October 10, 2014. (A.R. 351.) But he saw Plaintiff again on September 8, 2016 to discuss Plaintiff's ongoing complaints of bilateral hand numbness. (A.R. 386.) At that time, Plaintiff reported that his pain receded after his carpal tunnel surgery, but he has constant numbness. (A.R. 387.) Dr. Owen performed an exam and noted that Plaintiff's cervical spine range of motion is decreased on all planes. (A.R. 387.) Plaintiff had a positive Spurling test, decreased sensation to light touch, and weak hands. (A.R. 387.) Dr. Owen also reviewed Plaintiff's MRI's from 2016 and noted that Plaintiff had "tenting of the cord posteriorly with multilevel degenerate disc disease and decreased space available for cord." (A.R. 387.) Based on the MRI findings, Dr. Owen referred Plaintiff to a spine specialist. (A.R. 387.)

### c. *Penny Denning, PAC*

Plaintiff saw Physician Assistant Denning for a consultative examination on April 16, 2015.  (A.R. 368.)  PAC Denning examined Plaintiff, and noted he had no swelling or deformity, good hand grip, and hip pain.  (A.R. 370.)  She noted that Plaintiff was able to squat while holding onto a table, and could walk on his heels and toes, though he was slightly unstable on his toes.  (A.R. 370.)  PAC Denning also indicated that Plaintiff could walk up and down stairs without difficulty, but he complained of pain when straightening his leg and moving his right knee to his chest.  (A.R. 370.)  She also noted that Plaintiff's gait fluctuated between normal and abnormal.  (A.R. 370.)

PAC Denning additionally noted that Plaintiff "seems over dramatic at times with his C/O pain when I compare to previous evaluations in records and his history although significant other that is her[e] states he has bad pain every day." (A.R. 370.)  She also reviewed Plaintiff's spine x-ray and found no compression fractures and minimal degenerative changes, but range of motion loss in the lumbar.  (A.R. 370.)  Finally, she noted that although Plaintiff "would probably not tolerate heavy equipment work there are many other jobs he could do especially since carpal tunnel repair."   She questioned Plaintiff's complaints of pain, and opined that she does not think he qualifies for long term disability, but suggested an MRI would help qualify her opinion.  (A.R. 370.)

## C.     The ALJ's Findings

The ALJ followed the five-step sequential evaluation in considering

Plaintiff's claim.  First, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since the alleged onset date.  (A.R. 23.)  Second, the ALJ found the

Plaintiff had the severe impairments of degenerative disc disease of the spine and

carpal tunnel syndrome/median nerve compression.  (A.R. 23.)  Third, the ALJ

found Plaintiff did not have an impairment or combination of impairments that met

or medically equaled the severity of a listed impairment.  (A.R. 23.)  Fourth, the

ALJ stated Plaintiff has the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).
> The claimant is able to lift, carry, push, and pull 10 pounds frequently
> and 20 pounds occasionally; walk, stand, or sit six hours in an eight-
> hour workday; frequently climb ramps and stairs and ladders, ropes
> and scaffolds; frequently stoop. He must avoid concentrated exposure
> to extreme cold; can only frequently handle, finger, and feel.

(A.R. 24.)

The ALJ next found Plaintiff capable of performing his past relevant work

as a cook and supervisory cook.  (A.R. 29.)  The ALJ also found that other jobs

exist in the national economy that Plaintiff can perform based on his age,

education, work experience, and RFC, and identified cashier and ticket taker as

two such occupations.  (A.R. 30-31.)  Thus, the ALJ found Plaintiff was not

disabled.  (A.R. 30.)

///

## IV.   DISCUSSION

Plaintiff argues that the ALJ erred in the following ways: (1) improperly discounting the findings, diagnoses, and test results from his medical providers; (2) failing to properly credit his testimony; and (3) failing to incorporate all of his impairments into the vocational consultant's hypothetical questioning.  (Doc. 11.) Although not expressly identified as an issue, Plaintiff also argues in his brief that the ALJ erred at step three by failing to find that Plaintiff met Listing 1.04.  (Doc. 11 at 17; Doc. 13 at 4-6.)

### A.   The ALJ's Listing Determination

The claimant bears the burden to establish that he satisfies the required findings of the Listing of Impairments.  *Burch*, 400 F.3d at 683.  Plaintiff must provide medical evidence showing he meets *all* the requirements of the listed impairment.  *Kennedy v. Colvin*, 738 F.3d 1172, 1174 (9th Cir. 2013) (citing *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original)).  The ALJ is not required "to state why a claimant failed to satisfy every different section of the listing of impairments," but "the ALJ must discuss and evaluate the evidence that supports . . . her conclusion."  *Laborin v. Berryhill*, 692 Fed.Appx. 959, 961-62 (9th Cir. 2017) (quoting *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990) and *Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001) (internal quotations omitted)).  Here, the Court finds Plaintiff has failed to meet his burden of showing

he meets each requirement in Listing 1.04, and the ALJ's determination on this issue was supported by substantial evidence.

Listing 1.04 concerns disorders of the spine. To meet the Listing, Plaintiff must first show he has a disorder of the spine "resulting in compromise of a nerve root . . . or the spinal cord." If he can satisfy this threshold requirement, Plaintiff can meet the Listing by satisfying the requirements in subsection 1.04A, B, or C.

To meet Listing 1.04A, Plaintiff must establish "[e]vidence of nerve root compression characterized by [1] neuro-anatomic distribution of pain, [2] limitation of motion of the spine, [3] motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, [4] positive straight-leg raising test (sitting and supine)."

Alternatively, to meet Listing 1.04C, Plaintiff must establish "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in the inability to ambulate effectively, as defined in 1.00B2b."

The ALJ concluded that although Plaintiff had degenerative disc disease of the spine, he did not have an impairment or combination of impairments that met or equaled any of the impairments in the Listings. (A.R. 23.) With respect to

Listing 1.04, the ALJ found "the medical evidence does not establish the requisite evidence of nerve root compression . . . or spinal stenosis as required for listing 1.04. Moreover, there is no evidence that the claimant's back disorder has resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b)." (A.R. 23.) The ALJ went on to discuss the medical evidence supporting her finding more thoroughly at step four. (A.R. 24-29.) The Court finds the ALJ's conclusion was supported by substantial evidence for the following reasons.

First, the Court agrees with the ALJ that the medical evidence does not establish the first requirement of 1.04. While Plaintiff was diagnosed with degenerative disc disease, the record is inconclusive as to whether that condition resulted in compromise of a nerve root. Plaintiff's 2011 MRI indicated foraminal narrowing at the L4-5 level with "possible bilateral nerve root compression." (A.R. 375.) Plaintiff's 2016 MRI's, however, found spinal stenosis, but no indication of compromise of a nerve root at that time. (A.R. 383-85, 387.) Therefore, although the medical evidence offers the possibility of nerve root compromise in the lumbar region in the 2011 MRI, the record as of 2016 was inconclusive, at best.

Even if nerve root compromise in the lumbar spine was established, however, Plaintiff fails to meet Listing 1.04's remaining requirements under either subsection A or C. With respect to subsection A, the record may support that

Plaintiff had neuro-anatomic distribution of pain and limitation of motion in both his lumbar and cervical spine. But the record does not establish "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss" associated with the lumbar spine, or a positive straight-leg raising test in both the sitting and supine positions.[1]

Regarding Listing 1.04C's requirements, Plaintiff failed to establish that he has the inability to ambulate effectively as defined in 1.00(B)(2)(b). Listing 1.00(B)(2)(b) defines inability to ambulate effectively as "an extreme limitation of the ability to walk; i.e. an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined as generally having insufficient lower extremity functioning [] to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." In her decision, the ALJ specifically discussed Plaintiff's ability to ambulate effectively and cited treatment notes indicating Plaintiff "had a normal gait"; "had a symmetrical gait"; "had a stable gait"; "was able to walk up and down on stairs with complaints of marked difficulty"; and "was able to walk on heels and toes,

---

[1] Plaintiff had a positive straight-leg raising test on one occasion (A.R. 354), but there is no indication of a positive test in both the sitting and supine positions. Plaintiff also had atrophy in his hands (A.R. 350, 387), but there is no indication he had motor loss, atrophy, and associated muscle weakness due to his lumbar spine where the possibility of nerve root compromise was shown.

although was a bit unstable on toes." (A.R. 25.) The record supports the ALJ's finding that "there is no evidence that the claimant's back disorder has resulted in an inability to ambulate effectively." (A.R. 25.)

Considering the evidence recited above, the Court finds Plaintiff failed to meet his burden, and the ALJ's listing determination is supported by substantial evidence.

## B.     The ALJ's Evaluation of the Medical Evidence

Plaintiff argues the ALJ erred in failing to attribute the proper weight to the opinions, findings, and diagnoses of Dr. Owen, Dr. Espeland, and PAC Denning. (Doc. 11 at 19.) The Commissioner counters the ALJ reasonably evaluated the medical opinion evidence.

The ALJ considers the findings and opinions of "acceptable medical sources" such as licensed physicians and other qualified specialists when making her disability finding. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). The ALJ will also consider opinions from unacceptable medical sources and nonmedical sources. 20 C.F.R. § 404.1527(f). Opinions of treating physicians may only be rejected under certain circumstances. *Lester v. Chater*, 81. F.3d 821, 830 (9th Cir. 1995.) The ALJ must provide "clear and convincing reasons" for discounting the uncontradicted opinion of a treating physician. *Id.* The ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the

record" to discount a treating physician's controverted opinion. *Molina*, 674 F.3d at 1111; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ can accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors' are correct." *Reddick*, 157 F.3d at 725.

      a. *Thomas Owen, M.D.*

Plaintiff argues the ALJ failed to accord appropriate weight to Dr. Owen's findings and diagnoses. (Doc. 11 at 19, 20.) Although the record contains treatment notes from Dr. Owen, it does not contain a medical opinion by Dr. Owen concerning Plaintiff's functional capacity. (A.R. 348-52, 386-88.) The ALJ's opinion indicates she considered Dr. Owen's treatment notes, but did not assign any weight to them. (A.R. 25-26.)

Treatment notes, in general, do not constitute medical opinions. *See* 20 C.F.R § 416.927(a)(2) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). Dr. Owen did not offer

opinions regarding Plaintiff's limitations or ability to work. Therefore, his treatment notes are not medical opinions the ALJ must weigh. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (holding that where physician's report did not assign any specific limitations or opinions regarding the claimant's ability to work, "the ALJ did not need to provide 'clear and convincing reasons' for rejecting [the] report because the ALJ did not reject any of [the report's] conclusions."). Accordingly, the ALJ did not err by failing to assign a weight to Dr. Owen's treatment notes.

   b. *Darryl Espeland, D.O*

   Plaintiff argues the ALJ failed to give appropriate weight to Dr. Espeland's findings and opinion. (Doc. 11 at 19-20.) In her decision, the ALJ gave minimal weight to Dr. Espeland's opinion that Plaintiff's combined back and hand impairments likely rendered him disabled. (A.R. 27.) The ALJ reasoned that Dr. Owen's opinion as to whether claimant was disabled is a determination reserved to the Commissioner. (A.R. 27.) The regulations provide that medical source opinions finding a claimant to be disabled are reserved to the Commissioner "because they are administrative findings that are dispositive of a case." 20 C.F.R. § 404.1527(d)(1). Thus, the ALJ did not err in affording minimal weight to Dr. Espeland's opinion that Plaintiff was likely disabled.

The ALJ also considered Dr. Espeland's opinions that carpal tunnel surgery would improve his ability to work and be active, and that Plaintiff was "not destined to stay in the same employment that he is doing now which is cooking, being on hard surfaces, lifting, etc." (A.R. 27, 354.) The ALJ did not assign specific weight to these opinions, but she found the opinions did not include "specific functional abilities or limitations." (A.R. 27.) She also found the medical evidence in existence at the time to be unsupportive of the opinions. (A.R. 27.) The ALJ stated the objective medical evidence, "which includes only minimal objective findings regarding the claimant's back impairment and inconsistent findings regarding carpal tunnel syndrome, does not support such extreme conclusion (sic)." (A.R. 27.)

The Court agrees with the ALJ regarding Dr. Espeland's statement that carpal tunnel surgery would help Plaintiff's ability to work. Dr. Espeland does not conclude that Plaintiff's carpal tunnel condition renders him incapable of working. (A.R. 354.) Instead, he suggests that his ability to work and be active would improve with carpal tunnel surgery. (A.R. 354.) This statement is therefore "neither a diagnoses nor statement of [Plaintiff's] functional capacity." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 691-92 (9th Cir. 2009.) It is a recommendation for symptom improvement.

The ALJ erred, however, in not considering Dr. Espeland's opinion that Plaintiff is not destined to remain in his current employment because of his limitations. The ALJ apparently gave no weight to this opinion because the statement was not accompanied by specific functional abilities or limitations. (A.R. 27.) But that is not the case. Dr. Espeland's statement clearly identifies Plaintiff's limitations – "cooking, being on hard surfaces, lifting, etc." (A.R. 27.)

Moreover, the ALJ's findings that there were only "minimal objective findings regarding [Plaintiff's] back impairment," and that findings regarding Plaintiff's carpal tunnel syndrome were "inconsistent," are not supported by the record. (A.R. 27.) The objective medical evidence at the time established Plaintiff's diagnosis of degenerative joint disease and degenerative disc disease in his lumbar spine. His 2011 lumbar MRI showed mild to moderate degenerative changes and stenosis at multiple levers, and also demonstrated "moderately severe to severe foraminal narrowing bilaterally with possible bilateral nerve root compression at L4-5." (A.R. 375.) The ALJ's finding that his degenerative changes were mild "at most levels," is irrelevant and distorts the record when it is shown he has severe degenerative disease at other levels.

Subsequent imaging also confirmed significant degenerative disc disease. Plaintiff's 2016 lumbar MRI demonstrated moderate degenerative changes and bulging discs at multiple levels, with mild indentation of the [thecal] sac" at L2-3.

(A.R. 384.)  The report concluded that Plaintiff had "[a]quired type spinal stenosis relating to bulging disc, facet and ligament hypertrophy . . . most prominently at the level defined as L3-4."  (A.R. 385.)

Plaintiff's 2016 cervical MRI also demonstrated significant degenerative changes consisting of bilateral facet hypertrophy and severe bilateral neural foraminal narrowing at multiple levels.  (A.R. 383.)  In a September 2016 visit, Dr. Owen interpreted the MRI as showing "tenting of the cord posteriorly with multilevel degenerative disc disease and decreased space available for cord." (A.R. 387.)

Clinically, Plaintiff's physicians also documented multiple findings relative to his spinal issues, including a positive straight-leg test for his lumbar disease (A.R. 354), and a positive Spurling's sign for his cervical spine, with tingling to both thumbs and index fingers bilaterally (A.R. 349, 387).

In addition, the basis for the ALJ's statement that findings regarding Plaintiff's carpal tunnel were "inconsistent" is entirely unclear.  In 2013, Dr. Espeland noted bilateral paresthesia and weakness in his hands and a positive Tinel's sign bilaterally, causing him to suspect carpal tunnel syndrome.  (A.R. 356.)  Dr. Espeland further documented atrophy of muscles in his hands in 2014, and diagnosed "fairly severe" carpal tunnel syndrome.  (A.R. 354.)  A subsequent EMG study in 2014 demonstrated median nerve compression.  (A.R. 349.)  In

2014, Dr. Owens also documented obvious atrophy in the abductor pollicis brevis muscle belly (A.R. 349), and a positive Tinel's sign bilaterally (A.R. 356). Dr. Owens diagnosed carpal tunnel syndrome, with probable "double crush phenomenon," and he recommended surgery. (A.R. 350.) Plaintiff underwent a bilateral carpal tunnel release in October 2014. (A.R. 351.) Two years later, the pain in his hands had resolved, but he continued to experience hand weakness, and persistent numbness along his forearms and fingers. (A.R. 387.) In short, the history of Plaintiff's carpal tunnel syndrome is well documented, and any inconsistency of the findings related to that condition is not apparent.

Therefore, the ALJ's apparent rejection of Dr. Espeland's opinion of Plaintiff's ability to return to work as a cook is not supported by substantial evidence in the record. The ALJ's error is also not harmless. The ALJ determined that Plaintiff is not disabled in part because of her determination that he is capable of performing his past work as a cook and supervisory cook. (A.R. 29.)

c. *Penny Denning, PAC*

Plaintiff argues the ALJ improperly weighed PAC Denning's opinion because PAC Denning did not attempt to obtain the 2011 MRI to corroborate her opinions. (Doc. 11 at 19.) Further, Plaintiff contends the ALJ erred in developing the record by failing to provide PAC Denning with the 2011 MRI. (Doc. 11 at 29.)

The social security regulations define Physician's Assistants as "other sources," who "are not entitled to the same deference" as acceptable medical sources. 20 C.F.R. 404.1513(d); *Molina*, 674 F.3d at 1111. The ALJ need only provide germane reasons to discount a Physician's Assistant's testimony. *Molina*, 674 F.3d at 1111.

The ALJ gave PAC Denning's opinion that Plaintiff was not qualified for long-term disability minimal weight, finding that is a conclusion reserved to the Commissioner. (A.R. 27.) The remainder of PAC Denning's opinion considered by the ALJ consisted primarily of her findings on physical examination. The ALJ gave these findings some weight, noting that her opinion was co-signed by a medical doctor. (A.R. 27.) Therefore, the ALJ did not give PAC Denning's opinions controlling weight, and properly discounted them based on the nature of her conclusions and the fact that she was not an acceptable medical source. The Court thus finds the ALJ did not err in weighing PAC Denning's opinion.

The Court also finds the ALJ did not err by failing to provide PAC Denning with the Plaintiff's MRI. Although Plaintiff bears the burden to prove his disability, the ALJ has a duty to assist in developing the record "to assure that the claimant's interests are considered." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001), *See also,* 20 C.F.R. § 404.1512(d)-(f). The ALJ's duty is triggered by "[a]mbiguous evidence, or the ALJ's own finding that the record is inadequate

to allow for proper evaluation of the evidence." *Id.* (quoting *Smolen v. Chater*, 80 F.2d 1273, 1288 (9th Cir. 1996)).

Plaintiff contends that the ALJ's failure to provide PAC Denning with the MRI constituted error because PAC Denning stated, "I do not think he qualifies for long term disability although MRI would help qualify my opinion." (A.R. 370.) But, as noted above, the ALJ gave minimal weight to PAC Denning's opinion regarding disability, finding that was not a determination for her to make. The basis for the ALJ's finding would be the same, regardless of whether PAC Denning reviewed the MRI. More importantly, the 2011 MRI did not go unconsidered – it was ordered and evaluated by Dr. Espeland, and the ALJ considered its findings in her decision. (A.R. 25, 375.)

### C. The ALJ's Evaluation of Lay Evidence

Plaintiff argues the ALJ erred in failing to attribute proper weight to the findings of Certified Vocational Evaluator Susan Nielson.

The ALJ must consider evidence from nonmedical sources. 20 C.F.R. § 404.1527(f). "Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary must take into account . . . ." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis in original). The ALJ may reject lay testimony as to a claimant's symptoms if she "expressly determines to disregard such testimony and gives reasons germane . . . for doing so." *Lewis*, 236 F.3d at

510-11 (9th Cir. 2001.) Competent lay witness testimony "*cannot* be disregarded without comment." *Nguyen*, 100 F.3d 1462 at 1467 (quoting *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)) (emphasis in original).

Plaintiff argues the ALJ failed to provide appropriate weight to Ms. Nielson's findings, particularly her note that Plaintiff had leg numbness and lifted his leg when standing or walking. (Doc. 11 at 16.) Ms. Nielson prepared a Vocational Evaluation Report on August 15, 2014, documenting her findings and notes. (A.R. 317.) Because the report included Ms. Nielson's notes regarding Plaintiff's symptoms, the ALJ was required to consider the report and articulate reasons for rejecting it. But the ALJ did not mention the report in her decision at all. This was error. *See Turner*, 613 F.3d at 1224 (9th Cir. 2010) ("The regulations treat '[p]ublic and private social welfare agency personnel as 'other sources,' 20 C.F.R. § 404.1515(d)(3), and the ALJ may expressly disregard lay testimony if the ALJ 'gives reasons germane to each witness for doing so.'") (quoting *Lewis*, 236 F.3d at 511 (9th Cir. 2001). Nevertheless, the error was harmless.

In *Stout v. Comm'r of Soc. Sec. Admin.*, the Ninth Circuit explained that "where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the

testimony, could have reached a different disability determination." 454 F.3d 1050, 1056 (9th Cir. 2006).

Here, the Court can confidently conclude that no reasonable ALJ, when considering Ms. Nielson's report, could have reached a different conclusion. Ms. Nielson's report contained observations of Plaintiff's impairments that were also noted by Plaintiff's medical providers and discussed by the ALJ. During her evaluation of Plaintiff, Ms. Nielson noted, "[Plaintiff] appeared to be experiencing discomfort in his back and hands . . . he appeared to stoop more at the hips, then bend over to complete the task . . . he was observed moving and lifting up his leg." (A.R. 320.) These observations are substantially the same as those made by other sources which the ALJ considered. *See e.g.,* A.R. 25 ("claimant seemed to have trouble with his gait, other times his gait was normal"; "the claimant walked with an obvious limp on the left side and was hesitant to lock his knees"; "the claimant had a normal gait, although he was slightly crouched forward due to low back pain"; "he walked with a left limp and a wide based gait"); and A.R. 26 ("claimant complained of bilateral hand numbness and weakness"; "[h]e complained of persistent numbness").

Therefore, the ALJ's failure to consider the statements of Susan Nielson regarding her observations of Plaintiff was harmless error.

///

### D.     The ALJ's Credibility Determination

Plaintiff argues the ALJ's credibility determination was erroneous because the ALJ failed to provide sufficiently specific reasons for rejecting Plaintiff's testimony regarding his pain and limitations.  (Doc. 11 at 5.)  The Commissioner argues substantial evidence supports the ALJ's evaluation of Plaintiff's testimony.  (Doc. 12 at 6.)

The credibility of a claimant's testimony is analyzed in two steps.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.*  Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear, and convincing reasons" for doing so.  *Id.*  "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'"  *Turner*, 613 F.3d at 1224 n.3.  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Reddick*, 157 F.3d at 722 (9th Cir. 1998) (quoting *Lester*, 81 F.3d at 834)).  *See also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir.

2015.)  The clear and convincing standard "is not an easy requirement to meet: '[It] is the most demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014.)

To assess a claimant's credibility, the ALJ may consider (1) ordinary credibility techniques; (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  *Chaudry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989).  An ALJ may also take the lack of objective medical evidence into consideration when assessing credibility.  *Baston v. Comm'r of Soc. Sec. Admin*., 359 F.3d 1190, 1196 (9th Cir. 2004.) However, the ALJ may not reject the claimant's statements about the intensity and persistence of their pain or other symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements."  20 C.F.R. § 404.1529(c)(2).

Additionally, A claimant's inability to afford treatment cannot be used to disqualify him from receiving benefits or as a basis for finding his testimony not credible.  *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001 (9th Cir. 2006) (holding that benefits may not be denied due to a claimant's failure to obtain treatment he cannot afford); *See also, Fisher v. Colvin*, 2015 WL 1442064, at *17 (E.D. Cal. Feb. 20, 2015) ("Plaintiff's failure to receive medical treatment during

the period when she had no medical insurance *cannot* support an adverse credibility finding.") (emphasis in original). "The relevant question is not whether somewhere on the planet there exists a [treatment] that the claimant could use, if only he could afford the enormous price; rather, the question is whether the claimant, himself, can realistically obtain such a [treatment]." *Gamble v. Charter*, 68 F.3d 319, 322 (9th Cir. 1995).

Here, the first step of the credibility analysis is not in issue. The ALJ properly determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, and there is no argument that Plaintiff is malingering. (A.R. 24-25.) Therefore, the ALJ was required to cite specific, clear and convincing reasons for rejecting Plaintiff's subjective testimony about the severity of his symptoms.

The ALJ's discussion of Plaintiff's credibility is interspersed throughout a lengthy recitation of the medical evidence in the record, with only sporadic references to Plaintiff's credibility. (A.R. 24-28.) The ALJ cannot properly reject Plaintiff's testimony by merely reciting the medical evidence in support of her RFC finding. *Brown-Hunter*, 806 F.3d 487, 489 (9th Cir. 2015.) The ALJ must identify specifically which of the Plaintiff's statements she found not credible and which evidence contradicted that testimony. *Id.* at 493-94. The ALJ has failed to do so here.

With respect to Plaintiff's back impairment, the ALJ found that "the evidence supports that the claimant has some functional limitations due to degenerative disc disease, but not to the extent alleged." (A.R. 25.). To support this conclusion, the ALJ generally recites a summary of the medical record, but she also states (1) the "objective imaging revealed degenerative disc disease, but findings were mild or minimal at most levels"; and (2) his "treatment notes fail to support a debilitating back impairment." (A.R. 25.)

Regarding the objective imaging, as discussed above, the ALJ's characterization of the findings as mild or minimal is not supported by the record. Plaintiff had multiple findings of moderate to severe degenerative changes in both his lumbar and cervical spine. The ALJ's statement that the findings were mild "at most levels" ignores the fact that they were severe at other levels.

As to treatment notes, the ALJ states that there is no evidence of any treatment for Plaintiff's back condition between the 2011 MRI and a treatment note in October 2013, when his back was noted to be doing good with only intermittent flareups. (A.R. 25.) This is not a clear and convincing reason to discount Plaintiff's credibility for several reasons.

First, the statement is inaccurate. Plaintiff did have an epidural steroid injection at L4-5 on December 9, 2011. (A.R. 377.) Second, the period between 2011 and May 2013 predates the alleged onset of his disability.

33

In addition, the ALJ did not consider whether the lapse in treatment was due to lack of resources. The record demonstrates that Plaintiff did not have insurance and was having difficulty affording medical care. It was noted, for example, that Plaintiff could not afford a more aggressive workup for his cervical condition in 2014 because "he is self pay." (A.R. 350.) He was also having difficulty finding a surgeon to perform his carpal tunnel surgery because "he doesn't have insurance and they won't let him make payments." (A.R. 354.) As discussed above, a claimant's inability to afford treatment cannot be used as a basis for finding his testimony not credible.

Further, by focusing on one visit in 2013 when Plaintiff's back had been doing relatively well, the ALJ ignores the remainder of the record where Plaintiff was experiencing back pain. (A.R. 349, 353, 354, 360, 368, and 380.) The ALJ is required to examine the overall diagnostic record. *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014); *Garrison v. Colvin*, 759 F.3d at 1017 ("[I]t is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."). An ALJ is not permitted to cherry-pick from mixed results to support a denial of benefits. *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001).

With respect to Plaintiff's carpal tunnel syndrome, the ALJ's credibility discussion again consists primarily of a summary of the medical record. The ALJ

34

does state, however, that in April 2015 Plaintiff complained of continued hand numbness at times, but "[a] neurological and physical examination of his upper extremities and hands was entirely normal."  In support of this conclusion the ALJ cites a single note from the consultative examination done by PAC Denning.  The entirety of PAC Denning's examination and findings in this regard were "[u]pper extremity exam is within normal limits."  (A.R. 370.)  Not only does the entry not address Plaintiff's hand numbness and weakness, it is directly contrary to examinations and findings of his treating physicians, which document upper extremity numbness and weakness both before and after his carpal tunnel surgery. (*See e,g.,* A.R. 348-49 & 387.)  In fact, it is contradicted by the ALJ's own summary of the medical evidence immediately preceding and following that statement in her decision.  (A.R. 26.)

The ALJ also found that Plaintiff's testimony concerning his daily activities and work limitations was not supported by the objective medical evidence.  (A.R. 28, 29).  Again, however, the ALJ did not cite to specific evidence in the record which contradicts his testimony.  Instead, she generally found that the objective findings from Plaintiff's back imaging were mild; the record from one examination noted a normal gait and another noted a "normal station"; and the records reflect improvement of Plaintiff's carpal tunnel syndrome since surgery.  (A.R. 28, 29.)

As discussed above, however, the ALJ's characterization of the Plaintiff's imaging studies is not supported by the record. In addition, she does not explain why a normal gait noted on one examination (a preoperative note), and a "normal base of support" on another (the consultative exam) contradicts Plaintiff's testimony. This is particularly true when, as the ALJ acknowledges, there are multiple other entries in the record documenting an abnormal gait. The ALJ also does not explain how the improvement in Plaintiff's carpal tunnel syndrome discredits his testimony. As discussed above, while Plaintiff's carpal tunnel procedure resolved the pain in his hands, he continues to suffer from loss of strength and numbness in his and forearms and hands. (A.R. 387.) Plaintiff acknowledged in his testimony that the pain in his hands "isn't there anymore," but he is still affected by numbness and loss of strength. (A.R. 50.) Therefore, the improvement in his carpal tunnel the ALJ refers to in no way discredits the Plaintiff's testimony.

The most specific aspect of Plaintiff's testimony discussed by the ALJ was Plaintiff's testimony that pain woke him up at night. The ALJ pointed out that "there is no indication in the record that claimant complained of insomnia due to pain to any of his physicians." (A.R. 29.) But the ALJ ignores that the Plaintiff reported pain to his physicians multiple times. (A.R. 368, 377, 380, 354, 356,

353.)  The fact that his treating physicians did not note "insomnia" secondary to that pain is not a clear and convincing reason to discredit his testimony.

Further, to the extent the ALJ discounted Plaintiff's testimony on grounds that he made inconsistent complaints of pain, the purported inconsistencies are not supported by the record.  (A.R. 29.)  The ALJ cites PAC Denning's treatment notes to discredit Plaintiff's complaints of pain as inconsistent.  (A.R. 29.)  But PAC Denning's treatment note actually states, "seems over dramatic sometimes with C/O pain when I compare to previous evaluations in records and his history although significant other that is her[e] states he has bad pain all day."  (A.R. 370.)  Thus, the statement is much less conclusive than the ALJ suggests, and the record supports Plaintiff's consistent complaints of pain.  (A.R. 368, 354, 353, 349.)

Finally, the ALJ found it "notable that, despite the claimant's complaints of extreme back pain, his back has been treated with conservative measures."  (A.R. 29.)  Again, financial inability to obtain treatment cannot be used to support an adverse credibility finding.  The ALJ acknowledged that financial reasons may be a factor in Plaintiff's failure to attend physical therapy.  (A.R. 29.)  Aside from this passing reference, however, the ALJ did not consider whether gaps in treatment or the failure to obtain treatment were attributable to affordability.

Therefore, the Court finds the ALJ's credibility finding is not properly supported.  Several of the reasons provided by the ALJ for discounting Plaintiff's

37

credibility are not supported by the record, and those which are do not provide specific, clear, and convincing reasons to discredit Plaintiff's testimony.

### E. The ALJ's Failure to Incorporate Impairments into Hypothetical Questions Posed to the Vocational Expert

Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d at 756. If the assumptions in the hypothetical are not supported by the record, then the vocational expert's opinion has no evidentiary value. *Embrey*, 849 F.2d at 422.

Here, the ALJ concluded claimant is capable of performing his past work as a cook and supervisory cook, and further concluded that Plaintiff could perform other work in the national economy. (A.R. 29-31.) Plaintiff argues the vocational testimony cannot be relied on because it failed to account for all his limitations. (Doc. 11 at 5.) As discussed above, the Court concludes the ALJ failed to explain her reasons for discounting Plaintiff's testimony and failed to correctly evaluate the medical evidence. Accordingly, these errors may have affected the hypothetical the ALJ relied upon, and in turn, the ALJ's determination at steps four and five. Therefore, the Court finds the ALJ's determinations at steps four and five are not supported by substantial evidence.

/ / /

## V.    REMAND OR REVERSAL

Plaintiff asks the Court to reverse the ALJ's decision and grant her benefits. (Doc. 11 at 9.)  "[T]he decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court."  *Reddick*, 157 F.3d at 728.  If the ALJ's decision "is not supported by the record, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate.  On remand, the ALJ shall reconsider the weight she applies to Dr. Espeland's opinion and further re-evaluate Plaintiff's credibility and reconsider whether Plaintiff can perform work in the national economy based upon a hypothetical that incorporates all his impairments and limitations supported by the record.

## VI.    CONCLUSION

For the foregoing reasons, the Court orders that the Commissioner's decision is **REVERSED**, and this matter is **REMANDED** pursuant to sentence four of 42

U.S.C. § 405(g) for further proceedings consistent herewith.

DATED this 29th day of March, 2019.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge